**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bright LLC, | No. CV-17-00463-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Best Western International Incorporated, | |
| Defendant. | |

Bright is a Kansas entity that operates a hotel in Lenexa, Kansas. Bright applied to become a member of Best Western and to operate its hotel as a Best Western hotel. Pursuant to the parties' executed agreements, Best Western conditionally granted membership to Bright. In order for full membership to vest, Bright was required to perform certain renovations to its hotel by a deadline. Bright requested and received multiple extensions to the deadline. However, in December 2015, Best Western denied Bright's final extension request and terminated Bright's conditional membership. Bright sued Best Western for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and promissory estoppel. Best Western brought counterclaims for breach of contract and breach of the covenant of good faith and fair dealing. Best Western now moves for summary judgment on Bright's claims and Best Western's counterclaim for breach of contract. For the following reasons, Best Western's Motion for Summary Judgment (Doc. 127) is granted in part and denied in part.

**BACKGROUND**

Best Western International ("Best Western") is an Arizona non-profit organization that licenses the Best Western brand and reservation system to independent member hotels.[1] (Doc. 131 at 2.) Best Western is governed by a seven-member Board of Directors. (Doc. 131-1 at 16.) Bright LLC ("Bright") is a Kansas entity owned by Jayesh Koshiya (42%), Sanjay Koshiya (28%), and Ila Patel (30%). (Doc. 139-1 at 36.) In March 2013, Bright owned a hotel in Lenexa, Kansas, operating under the Suburban Extended Stay brand (the "Hotel"). (Docs. 131 at 3; 139 at 4.) Jayesh Koshiya ("Koshiya") was the manager of Bright. (Doc. 139-1 at 35.) Koshiya testified he was also "the owner or part owner of about at least a half dozen or seven hotels." (Doc. 139-3 at 16.)

In March 2013, Bright applied to become a Best Western member and to convert the Hotel to the Best Western brand. (Docs. 131 at 3; 139 at 4.) Koshiya signed the application as Bright's authorized representative. (Doc. 131-1 at 19–20.) The Membership Application stated: "By submitting this Membership Application ('Application') [you] are requesting that Best Western International, Inc. ('Best Western') consider your request to affiliate the property identified in this Application ('Property') with the Best Western brand." (Doc. 131-1 at 19.) The Application further stated: "In the event the Application is approved by the Board, and as a prior condition to your membership, you will be required to submit: (a) an executed Terms of Approval letter ('Approval Letter') which will include conditions of membership (e.g. completion of a Property Improvement Plan); and (b) an executed Membership Agreement ('Agreement'). You may not hold yourself out to the public as a Best Western branded hotel until all conditions are met." (Doc. 131-1 at 19.)

The Application contained an "Applicant Information" form. Under a section titled "Proposed Construction/Under Construction Project," the form noted: "All facilities associated with the hotel Property . . . are subject to Best Western inspection. If the Property is approved for Best Western membership, all such facilities will be subject to any renovation deemed necessary by Best Western." (Doc. 131-1 at 24.) The same section

---

[1] Unless otherwise noted, factual statements included in the Court's summary are undisputed.

contained a question: "Is financing in place?" Koshiya checked the "yes" bubble and wrote Valley View Bank KS as the source of financing. (Doc. 131-1 at 23.) In his deposition, Koshiya testified that when he answered this question, he "did not have the financing in place according to what Best Western wanted to submit the application, but [he] had existing financing in place for [his] existing hotel, which is a Suburban Extended Stay." (Doc. 131-2 at 66.) In other words, when he answered "yes" to the question about having financing in place, he meant there was existing "debt on the hotel as opposed to financing to do the conversion." (Doc. 131-2 at 66.) Koshiya further testified that, at the time of the application, there was no financing in place to convert the hotel to a Best Western. (Doc. 131-2 at 66.)

On May 9, 2013, Koshiya emailed Greg Burgett, Best Western's Regional Director of North American Development, asking whether Best Western had received Bright's application and check. Koshiya also requested Burgett to "[p]lease get elevator and pool waiver approval as well." (Doc. 139-4 at 2.) Burgett responded that Best Western had received the signed documents and check. Burgett also stated: "Additionally, the elevator and pool waivers will not be a problem." (Doc. 139-4 at 2.)

Best Western conditionally approved Bright's application through a letter dated May 28, 2013. (Doc. 131-1 at 38.) Enclosed within the letter were two additional documents: The Terms of Approval and Membership Agreement. (Doc. 131-1 at 38.) Best Western's letter stated: "You must indicate your agreement with the Membership Agreement and the Terms of Approval by returning completed, signed originals of both by June 12, 2013." (Doc. 131-1 at 38.) Both documents indicated that Best Western membership would not fully vest until certain conditions were met. (Doc. 131-1 at 55 ("Only after all of the Terms of Approval have been timely satisfied, will the Best Western Membership be granted and Membership procedural rights become available."; Doc. 131-1 at 76 ("Membership rights shall not be granted until such time as the Property has been activated on Best Western's reservation system and the Initial Term has begun.").)

The Terms of Approval required: "By signing and returning the Membership Agreement and the Terms of Approval, you agree . . . [t]o complete the Property Improvement Plan." (Doc. 131-1 at 42.) It further stated: "The property has up to June 12, 2014 (twelve months) to open and operate as a Best Western branded hotel," and that the "application was approved with 110 units. Unit Count Changes are subject to Best Western approval." (Doc. 131-1 at 41, 49.) In the event Bright could not open and operate within that time, the Terms of Approval provided: "If more than 'twelve months' are needed to be open and operating as a Best Western branded hotel, and an extension is requested at least thirty days prior to the expiration of this 'twelve month' period, Best Western shall have sole discretion as to whether to grant an extension and whether a fee shall be required for the extension (e.g., a monthly fee)." (Doc. 131-1 at 41.) Best Western's internal policy governed extension requests generally: Best Western management was authorized to "(a) Grant a total of six months of extended time to Activate. The six months of extended time shall be at no cost to the Property; and (b) Grant up to twelve months of additional time in three-month increments to Activate upon the request and agreement of the Property to pay one-fourth (1/4th) of the Property's Best Western Entrance Fee for each three-month increment." (Doc. 131-1 at 5.) Management was not permitted to grant extensions past eighteen months and "anything further would have to go to the Board to be approved." (Doc. 131-2 at 88.)

The Membership Agreement provided, in relevant part, that Bright "shall have no recourse of any kind against Best Western, its directors, officers, employees, agents or Members for failure to grant Membership unless [Bright] has strictly, absolutely and timely complied with each and every requirement imposed upon Member by Best Western." (Doc. 131-1 at 79.) It also limited damages to "actual damages for any breach or default by Best Western of any obligation or duty owed to [Bright]," and further limited "Best Western's liability for any damages [to] the amount of Membership fees actually paid by [Bright] in connection with the Property, during a single fiscal year in which the breach or default occurred." (Doc. 131-1.)

Among the conditions required by the Terms of Approval was Bright's performance of substantial renovations in accordance with a Property Improvement Plan. (Doc. 131-1 at 42.) The Property Improvement Plan listed required improvements including, for example, adding a breakfast room and renovating the lobby. (Doc. 131-1 at 58–71.) In addition, the Property Improvement Plan stated that hotels with 100–199 rooms, as Bright's hotel had, required a minimum of two elevators. (Doc. 131-1 at 62.) Prior to signing the documents, Bright attempted to obtain a waiver of the second elevator requirement. (Doc. 131-2 at 77.) On May 28, 2013, Burgett informed Koshiya "the waiver for the second elevator was denied due to [the Hotel] being a four story structure," despite Burgett's earlier email stating that obtaining the wavier would not be a problem. (Docs. 131-1 at 74; 139-4 at 2.) Burgett apologized and asked if Koshiya wished to "[withdraw] this project and have the check returned to you." (Doc. 131-1 at 74.) Nevertheless, on June 20, 2013, Koshiya signed both documents on behalf of Bright and agreed to be jointly and severally liable for Bright's obligations to Best Western. (Docs. 131 at 4; 139 at 6.)

On November 11, 2013, Koshiya emailed Amy Lowry, Best Western's New Member Development Manager. Koshiya informed Lowry that Bright had "just started initial work for conversion." (Doc. 131-1 at 87.) Koshiya further stated: "We are just getting [a] little set back from our existing [lender] as this is going to be expensive renovation project and we required to have closer to 2 million additional loan." (Doc. 131-1 at 87.) He stated Bright had found another lender to finance the conversion and that he thought "this deal is going to go through 100%." (Doc. 131-1 at 87.) Because of the need for additional financing, Koshiya requested an "additional 12 months extension" to the original deadline of June 12, 2014. (Doc. 131-1 at 87.) On February 11, 2014, Koshiya again emailed Lowry, stating "I would like to request extension for [the conversion project] till end of December 2014." (Doc. 131-1 at 95.) Best Western approved this extension: Lowry wrote to Koshiya confirming that "two 90 day gratis extensions to be open and operating as a Best Western hotel has been granted until December 12, 2014." (Doc. 131-

1 at 97.) Lowry informed Koshiya that although these two extensions were free, any additional extensions would require a fee. (Doc. 131-1 at 97.)

On November 24, 2014, Koshiya emailed Verena Zurcher, another Best Western New Member Development Manager. (Doc. 131-2 at 16.) Koshiya stated: "During last year we made our full efforts to get this project loan approved and met with many [lenders] but it was difficult time for everyone in banking industry. . . . We did not start or perform any work so far because we were not able to get the additional fund[ing] required to finish this project. At this point we have met the banker and they are taking our loan to the committee and have assured us that they will get it approved and issue us commitment letter. We feel very strong about getting it approved." (Doc. 131-2 at 16.) Koshiya asked for "another 7 to 8 month[s] of extension to get this project started and completed." (Doc. 131-2 at 16.) On December 18, 2014, Cheryl Pollack, Best Western's Director of Member Care and Development Administration, responded to Koshiya's request. She confirmed that "an extension to be open and operating as a Best Western hotel has been granted until September 12, 2015." (Doc. 131-2.) This included three 90-day extensions; Bright was required to pay $14,500 for each extension. (Doc. 131-2 at 13.) Bright paid the required fees. (Doc. 131 at 9.)

In January 2015, Bright again tried to obtain a waiver for the second elevator requirement. (Doc. 131-2 at 77.) Koshiya testified that he spoke with Gloria Gaddis and Greg Burnett,[2] Best Western representatives, about potentially reducing the number of rooms in the Hotel in order to waive the second elevator requirement. (Doc. 131-2 at 77.) The Property Improvement Plan required Bright to "[p]rovide a minimum of two elevators for hotels with 100–199 rooms." (Doc. 131-1 at 62.) Koshiya testified Bright was willing to "cut down a few rooms and make the room count around 98 rooms so we don't have to have the second elevator." (Doc. 131-2 at 77.) On January 20, 2015, Best Western denied Bright's request for the waiver after consideration by the Best Western Review Committee. (Doc. 139-3 at 51.) Koshiya testified Best Western denied his request because its bylaws

---

[2] Koshiya could not recall when he had the conversation. (Doc. 131-2 at 77.)

required hotels with four stories or more—even if they had fewer than 100 rooms—to have at least two elevators, which was not explicitly stated in the Property Improvement Plan. (Doc. 131-2 at 77–78.)

On August 26, 2015, Koshiya requested yet another extension. (Doc. 131-2 at 27.) Koshiya wrote: "There are several reasons we could not start the project on timely manner and they are listed below. Now we are 100% ready to start construction and should be able to complete it quickly." (Doc. 131-2 at 13.) Koshiya requested an extension until March 31, 2016 and stated he was "100% sure that [Bright] will be able to complete everything on or before 3/31/2016." (Doc. 131-2 at 28.) David Nuss, Best Western's Regional New Member Development Manager, communicated with Regional Director Chris Campbell regarding Bright's extension request. (Doc. 139-6 at 8.) Nuss informed Campbell: "Their extension is up 9/12. They will need another paid extension to bring them to 12/12/15 (this would be their 4th paid extension). They are not expecting to be completed until the end of Feb of 2015 so any extension requests following this 9/12 to 12/12/15 request would have to go before [B]oard." (Doc. 139-6 at 8.) Campbell responded: "I'm ok with this next 90 days but I'm going to start working a new construction deal in the market, so [Bright] may not get the one in December if that deal comes about." (Doc. 131-2 at 30.) Nuss also emailed Ron Pohl, Senior Vice President of Brand Management and Member Services, for approval of Bright's extension request. (Doc. 139-6 at 40.) Pohl responded: "Approved, but this is the last one." (Doc. 139-6 at 40.) On September 4, 2015, Pohl wrote to Koshiya and granted a 90-day extension until December 12, 2015. (Doc. 131-2 at 33.) This extension required another $14,500 fee. (Doc. 131-2 at 33.) Although Koshiya had asked for an extension until March 2016, Pohl did not grant the extension until March. Rather, Pohl informed Koshiya that "any further extension requests will require review and approval by the Best Western Board of Directors." (Doc. 131-2 at 33.) Bright states it began demolition on September 8, 2015, and notified Best Western of its demolition schedule. (Docs. 136 at 5; 139-1 at 14.)

In November 2015, Koshiya asked Best Western for another extension. (Doc. 131-2 at 47.) Koshiya emailed Nuss, attaching photographs of renovation progress, and promised he "will not need any more extension after this one." (Doc. 131-2 at 47.) Koshiya informed Nuss that Bright had spent "1.2 million out of pocket and we will [be] spending 1 million in next 90 days to finish outstanding work." (Doc. 131-2 at 47.) Internal emails show that Best Western considered the options of granting Bright additional paid extensions or allowing another hotel developer to construct a new Best Western hotel in the same area. In the event Best Western received an application from the other developer, Vice President of Owner Relations Michael Morton suggested "telling the board we have a new construction app and recommend we cut ties with [Bright]." (Doc. 139-4 at 19.) In a letter dated December 15, 2015, Best Western informed Koshiya the Board had reviewed his extension request and decided to not approve the request. (Doc. 131-2 at 53.) The letter further stated: "As a result, Best Western International, Inc. considers your application withdrawn and has terminated your conditional approval for this project." (Doc. 131-2 at 53.) Best Western additionally asked Bright to send payment in the amount of $111,000.000, pursuant to a provision in the Terms of Approval that stated: "If the applicant conducts hotel operations at the approved location under another brand or as an independent hotel, the applicant shall pay to Best Western a fee equal to one thousand dollars ($1,000) per hotel guest room[.]" (Doc. 131-2 at 53.) To date, Bright has not made this payment. (Doc. 139 at 44.)

Best Western moved for summary judgment on April 30, 2018. (Doc. 127.) On July 27, 2018, the Court granted Bright's Motion to Amend the Complaint to add additional defendants. (Doc. 155.) The parties subsequently stipulated to dismiss Defendants PG West, Beth Campbell, and Dilipkumar Patel. (Doc. 186.) Upon reconsideration, the Court denied the Motion to Amend. (Doc. 190). As such, the Amended Complaint (157) shall be stricken and the remaining individual defendants shall be terminated.

**LEGAL STANDARD**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for summary judgment, all evidence must be construed in the light most favorable to the non-moving party. *Id.*

**ANALYSIS**

**I.     Bright's Request for Additional Time for Discovery**

The Court first addresses Bright's request for relief under Rule 56(d).[3] Fed. R. Civ. P. 56(d). Under Rule 56(d), the Court may deny [or continue] summary judgment if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."[4] The Ninth Circuit has instructed that "a requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home and Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).

Bright argues summary judgment is "premature" because "discovery is not complete and has been at a standstill since March 19, 2018." To support its 56(d) request, Bright submitted affidavits from Robert Haupt, its counsel, and Sanjay Koshiya, a principal of Bright. In his affidavit, Haupt declares: "Considerable discovery remains to be done in this case. As a result, certain facts which preclude summary judgment cannot be presented

---

[3] Bright also argues summary judgment must be denied because Best Western's exhibits were not authenticated. Assuming without deciding that authentication was necessary, Best Western cured this issue when it submitted declarations authenticating its exhibits in its Reply. (Doc. 145 at 14.)

[4] Bright appears to refer to 56(d) and 56(f) interchangeably. The 2010 Amendments to Rule 56 moved the provisions of subdivision (f) to subdivision (d) without substantial change.

- 9 -

at this time." (Doc. 139-1 at 6.) According to Haupt, Chris Campbell, a former Best Western employee, has yet to be deposed and has "personal knowledge of BW's efforts to solicit another applicant in the Lenexa, Kansas area and its decision to select another hotel developer for the area and terminate Bright's conditional membership." (Doc. 139-1 at 6.) Haupt also states: "Additional depositions may need to be taken of BW witnesses Ron Pohl and Greg Burgett." (Doc. 139-1 at 8.) Further, Haupt declares the depositions of Hasmukh "Harry" Patel and Sanjay Koshiya were stayed while Bright's Motion to Disqualify Counsel was pending. (Doc. 139-1 at 7.) Finally, Bright argues that at the time Best Western moved for summary judgment, the deadline for the parties to make expert disclosures and exchange expert reports had not yet passed. (Doc. 136 at 12.)

Bright's request under Rule 56(d) is denied. The deadline to complete fact discovery was April 2, 2012. (Docs. 81; 191.) Bright is incorrect that fact discovery was "at a standstill" when Best Western moved for summary judgment on April 30, 2018. As the Court stated in a prior order, Bright is not entitled to additional fact discovery and to take the depositions of Campbell, Pohl, or Burgett. (Doc. 191.) The Court previously explained Bright's motion to stay applied only to the depositions of Sanjay Koshiya and Hasmukh "Harry" Patel. (Doc. 191 at 2.) Both of these individuals are principals of Bright. Best Western, not Bright, was scheduled to depose them before the stay. Bright does not show how Best Western's failure to depose these witnesses has precluded *Bright* from discovering facts essential to oppose summary judgment. Bright's argument regarding expert disclosures similarly does not explain what additional facts Bright needs to oppose summary judgment. While the parties had not made expert disclosures or exchanged expert reports when Best Western's motion for summary judgment was filed, Bright submitted affidavits from two proposed expert witnesses. (Doc. 139-1 at 7.)

**II. Bright's Claims**

Bright sued Best Western for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; and (4) promissory estoppel.

First, Bright claims Best Western breached the Terms of Approval by terminating the agreement and withdrawing Bright's application for membership. (Doc. 1 at 9.) Best Western points out the Terms of Approval provided: (1) "The property has up to June 12, 2014 . . . to open and operate as a Best Western branded hotel"; (2) "Any failure to comply with these Terms of Approval may result in cancellation of the application and the Membership Agreement"; and (3) "If more than [12 months] are needed to be open and operating as a Best Western branded hotel . . . Best Western shall have sole discretion as to whether to grant an extension." (Doc. 131-1 at 41; 54.) There is no question the Hotel did not open and operate as a Best Western branded hotel by June 12, 2014. (Doc. 131-1 at 41.) Best Western cancelled Bright's application and conditional membership pursuant to Best Western's failure to fully comply with the Terms of Approval.

In Response, Bright does not point to any provision of the contract that Best Western allegedly breached. Rather, Bright argues "fraud vitiates all transactions" and Best Western "breached the contract . . . through its fraudulent actions and by making significant misrepresentations to Bright during the renovation of the Hotel." (Doc. 136 at 7 (citation omitted).) There is no fraud claim in this case and the Court previously denied Bright's motion to add fraud claims. (Doc. 155.) Bright has not cited any cases supporting its theory that Best Western breached the contract through fraudulent actions. In any event, the Membership Agreement provided Bright "shall have no recourse of any kind against Best Western . . . for failure to grant Membership unless [Bright] has strictly, absolutely and timely complied with each and every requirement imposed upon Member by Best Western." (Doc. 131-1 at 77.) There is no dispute that Bright did not comply with the requirement that it open and operate a Best Western branded hotel by the required deadline. (Doc. 131-1 at 41.) Therefore, Best Western's motion for summary judgment regarding the breach of contract claim is granted.

Second, Bright claims Best Western breached the covenant of good faith and fair dealing when it granted Bright the September 2015 extension despite knowing Bright would require more time, and when it discussed with another hotel developer the possibility

of opening a different Best Western hotel in the same area. Under Arizona law, every contract implies a covenant of good faith and fair dealing. *See Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 423 (Ariz. Ct. App. 2002). When a contract grants one party discretion, that party can still "breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Id.* at 424. Here, Best Western had the "sole discretion" to grant extensions under the Terms of Approval. (Doc. 131-1 at 41.) Bright argues material questions of fact exist as to whether Best Western acted in bad faith by exercising its discretion in a way that was inconsistent with Bright's reasonable expectations. Aside from conclusory statements that Bright had a reasonable expectation that Best Western would continue granting extensions until the project was complete, (Doc. 139-1 at 19), Bright cites no evidence showing Best Western acted in bad faith.[5] Bright points to internal Best Western emails discussing the possibility of allowing another hotel developer to construct a Best Western hotel in the same area and "cut[ting] ties" with Bright. (Doc. 139-4 at 19.) But Best Western is "entitled to act to protect [its] financial interest . . . without violating the covenant of good faith and fair dealing," especially in light of Bright's repeated unfulfilled promises about its renovation plans. *ABCDW LLC v. Banning*, 241 Ariz. 427, 439 (Ariz. Ct. App. 2016). Bright also suggests Best Western acted in bad faith when it granted Bright its last extension despite knowing it was insufficient to complete the project, citing an email from Pohl stating "[t]his is the last one" as evidence that Best Western never intended to grant additional extensions to allow Bright to finish renovations. However, Best Western is correct that Pohl had no authority to grant extensions beyond the sixth, which Pohl expressly told Bright in his September 5, 2015, letter stating: "Please be aware that any further extension requests will require review and approval by the Best Western Board of

---

[5] While Bright suggests Best Western employees represented Best Western would grant sufficient extensions for the Hotel to open, Bright cites no evidence supporting this proposition. (Doc. 136 at 5.)

Directors." (Doc. 131-2 at 33.) Additionally, Bright's own evidence shows Best Western seriously considered granting Bright another extension in December 2015, months after Pohl's email. (Doc. 139-4 at 19.)

In *Regency Midwest Ventures Limited P'ship v. Best Western Int'l, Inc.*, the District of Arizona considered a similar case involving Best Western and one of its members. CIV-16-02491, 2017 WL 992357 (D. Ariz. Mar. 15, 2017). The plaintiff argued Best Western breached the implied covenant of good faith and fair dealing because it exercised its discretion in a manner inconsistent with the plaintiff's reasonable expectations: Best Western had granted the plaintiff two extensions to complete a property improvement plan before refusing to grant a third extension and terminating the plaintiff's membership. *Id.* at *4. The court rejected the plaintiff's argument that "it was reasonable to believe that as long as they made adequate progress towards meeting Best Western's standards, then Best Western would not have terminated the Membership Agreement." *Id.* Here, as in *Regency Midwest*, Bright repeatedly failed to meet agreed-upon deadlines. Best Western made it clear that failure to meet deadlines can be grounds for termination. No evidence in the record suggests Best Western represented or led Bright to believe Best Western would continue to grant extensions until the project was complete. As such, Best Western's motion for summary judgment regarding the breach of good faith and fair dealing is granted.

Third, Bright claims Best Western was unjustly enriched when it collected $58,000.00 in extension fees from Bright, despite ultimately cancelling Bright's application. (Doc. 136 at 9.) Best Western argues the contract expressly provided Best Western with the discretion to decide "whether a fee shall be required for the extension," and an unjust enrichment claim is unavailable where the parties have a contract that covers the subject matter in dispute. (Doc. 127 at 15); *Trustmark Ins. Co. v. Bank One, Ariz., NA,* 48 P.3d 485, 493 (Ariz. Ct. App. 2002). Bright again invokes alleged fraud to support its unjust enrichment claim: "Disputed issues of material fact exist as to whether BW's actions toward Bright were fraudulent, when it accepted $58,000 in fees from Bright[.]" (Doc. 136

at 9.) Because there is no fraud claim and Bright has not cited cases showing how alleged fraud can support an unjust enrichment claim, Best Western's motion for summary judgment is granted with regard to the unjust enrichment claim.

Fourth, Bright has presented no evidence supporting its claim of promissory estoppel. In Response, Bright's only discussion of this claim is the following sentence: "As to Bright's promissory estoppel or detrimental reliance claim, Bright's expectations of a final extension were reasonable in light of BW's representations and prior course of dealing." (Doc. 136.) Under Arizona law, a claim of promissory estoppel requires a showing that the defendant "made a promise and should have reasonably foreseen that [plaintiff] would rely on that promise." *Higginbottom v. State*, 203 Ariz. 139, 144 (Ariz. Ct. App. 2002). Bright has not identified any such promise and Best Western's motion for summary judgment is granted as to this claim.

### III. Best Western's Counterclaim

Best Western moves for summary judgment on its breach-of-contract counterclaim for liquidated damages. The Terms of Approval provided: "If the applicant conducts hotel operations at the approved location under another brand or as an independent hotel, the applicant shall pay to Best Western a fee equal to one thousand dollars ($1,000) per hotel guest room within thirty (30) days of Best Western's demand for such fee payment." (Doc. 131-1 at 42.) Best Western argues it is entitled to $110,000 from Bright because Bright continued to operate the Hotel as a Suburban Extended Stay after termination of the contract. (Doc. 127 at 17.)

The provision at issue is ambiguous on its face and in application. While Best Western argues it is entitled to damages because Bright operated as another brand after the contract was terminated, the provision does not specify *when* Bright was prohibited from operating as another brand—for example, whether Bright was expected to keep the Hotel closed during the entire conditional membership or whether this provision applied only after Bright failed to open and operate as a Best Western by the required deadline. The record indicates Best Western employees visited the Hotel while Bright was a conditional

member and knew it was operating as a Suburban Extended Stay, but did not raise any concerns about Bright operating under another brand at the time. Further, although Best Western's counterclaim is one for breach of contract, Best Western has not pointed to the contractual provision that Bright allegedly breached. And while Best Western argues Bright is required to pay $1,000 each for 110 hotel rooms because Bright's application was approved for 110 rooms, Best Western does not state how many hotel rooms Bright actually operated when it allegedly breached the contract. Because Best Western has not provided sufficient evidence supporting its breach-of-contract claim, summary judgment is denied. *See Nelson v. Cannon*, 126 Ariz. 381, 386 (Ariz. Ct. App. 1980).

Finally, the Court notes Best Western has not moved for summary judgment on its counterclaim for breach of the implied covenant of good faith and fair dealing.

Accordingly,

**IT IS ORDERED** Best Western's Motion for Summary Judgment (Doc. 127) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** Best Western's Motion to Exceed Page Limit (Doc. 144) is **GRANTED**.

**IT IS FURTHER ORDERED** Bright's Amended Complaint shall be stricken. (Doc. 157.)

**IT IS FURTHER ORDERED** the Clerk of Court shall terminate the following defendants: Terrance Bichsel, James Cosgrove, Anthony Klok, Julie Montmaneix, Jayesh Patel, and Terry Porter.

This matter is ready for trial. Accordingly, the Court enters the following orders.

**IT IS ORDERED** all Motions in Limine are due **June 19, 2019**. Responses are due ten days afterward. No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the contents of each planned motion. No Motion in Limine should be filed if the other party does not oppose the relief requested.

**IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order, if not already filed, is due July 3, 2019.

**IT IS FURTHER ORDERED** the parties will separately file their Proposed Findings of Fact and Conclusions of Law no later than July 18, 2019.

**IT IS FURTHER ORDERED** no later than July 22, 2019, the parties shall deliver to chambers excerpts of the deposition testimony they propose to present at trial, in compliance with the procedures available on the Court's website (found in Deposition Designation Procedure for Judge Silver), including but not limited to: Plaintiffs highlighting in yellow the portions they wish to offer and Defendants highlighting in blue those portions they wish to offer. If either party objects to the proposed testimony, a specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin adjacent to the proposed testimony.

**IT IS FURTHER ORDERED** a final pretrial conference is set for **August 7, 2019 at 2:00PM**.

**IT IS FURTHER ORDERED** trial to the Court is set for **August 20, 2019 at 8:30AM**. Estimated length of trial is two days.

**IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders, Forms & Procedures for Hon. Roslyn O. Silver.

Dated this 28th day of February, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge